UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

      v.

JOHN ARENAS POLO,

              Defendant.

-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
23-CR-432 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On October 1, 2024, John Arenas Polo ("Defendant") pled guilty to one count of conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371. Plea Agreement ("Plea") ¶ 1, ECF No. 70. The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to fifty-seven (57) months' imprisonment; two (2) year(s) of supervised release with both the standard and special conditions of supervision; restitution in the amount of $4,894,678.00, plus interest, as set forth in the forthcoming Order of Restitution; forfeiture of items identified in the Order of Forfeiture, ECF No. 107; and a $100.00 mandatory special assessment.

## I.      Background

### *Factual Background*

From June 2022 through August 2023, Defendant, Angel Betancur-Lopez ("Betancur-Lopez"), Katherine Quintero Daza ("Daza"), and Carlos Alberto Manrique Ducuara ("Ducuara," together with Defendant, Betancur-Lopez, and Daza, "Defendants") engaged in multiple thefts and attempted thefts across the United States, during which they stole jewelry, watches, antique coins and sums of United States currency. Presentence Investigation Report ("PSR") ¶¶ 4–22, ECF No. 104; Gov't Sent'g Mem. at 1–2, ECF No. 130.[1] To carry out these thefts, Defendants employed coordinated distractions, surveillance of potential targets and/or individual victims,

---

[1] Citations are to the docket in *United States v. Daza, et al.*, 23-CR-432. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

disguises, and transportation of stolen property across state lines.[2]  PSR ¶ 4; Gov't Sent'g Mem. at 1.

Defendant was involved in at least nine (9) thefts and four (4) attempted thefts.  *See id.* ¶¶ 6–18, 22.[3]

On June 29, 2022, Defendant and Ducuara followed an individual out of a bank in Flushing, New York, and stole an envelope containing $10,000.00 in U.S. currency.  *Id.* ¶ 6; Gov't Sent'g Mem. at 1.  Defendant acted as a lookout while Ducuara discreetly reached into the victim's unattended vehicle and took a manila envelope containing the currency.  PSR ¶ 6.

On July 8, 2022, Defendant and Ducuara followed an individual leaving a jewelry store at the International Mall in Tampa, Florida.  *Id.* ¶ 7; *see* Gov't Sent'g Mem. at 2 (citing PSR).[4] After the individual approached her vehicle, Ducuara punctured the vehicle's rear tire.  PSR ¶ 7. The individual drove approximately a half-mile before pulling over due to the flat tire.  *Id.*  A tow-truck arrived and the individual transferred a bag into the cabin of the truck.  *Id.*  When the individual and truck driver were not looking, Ducuara took the bag from the unlocked truck.  *Id.* The bag did not contain the jewelry the individual purchased from the jewelry store.  *Id.*

---

[2] Defendants utilized various aliases to shield their true identities.  This Defendant is otherwise known as "Jairo Antonio Garzon Castenada"; Daza as "Jessica Marlen Salazar" and "Catalina Aponte Garcia"; Ducuara as "Mauricio Morena," "Miguel Angel Conde Lucas," "Mario Moncaleano Moreno" and "Alberto Piedra Encarnacion"; and Betancur-Lopez as "David Gamboa."  Third Superseding Indictment (the "Indictment") ¶ 1, ECF No. 24.

[3] The Government notes Defendant was involved in "at least eight thefts."  Gov't Sent'g Mem. at 1.  Their list, however, does not include the August 18, 2023 theft in Edison, New Jersey.  *Compare* Gov't Sent'g Mem. at 1–2 *with* PSR ¶ 22.

[4] The PSR indicates Daza participated in this attempted theft as well as the attempted theft on August 7, 2022 in Tampa, Florida and the theft on October 26, 2022, in New York, New York.  *Id.* ¶¶ 7–8, 12. However, the Government conceded Daza was not involved in those events.  *See* Second Add. to the PSR as to Katherine Quintero Daza at 1, ECF No. 117.

Ducuara and Defendant then left the scene. *Id.*   The U.S. Probation Office ("Probation") and the Government characterized this as an attempted theft. *Id.*; Gov't Sent'g Mem. at 2.[5]

On August 7, 2022, Defendant and Ducuara followed an individual leaving a jewelry store at the International Mall in Tampa, Florida.  PSR ¶ 8; *see* Gov't Sent'g Mem. at 2.  Defendant and Ducuara were unsuccessful in retrieving jewelry from the individual.  PSR ¶ 8.

On August 15, 2022, Defendants entered a jewelry convention in Chicago, Illinois, and stole items collectively valued at $385,900.00.  *Id.* ¶ 9; Gov't Sent'g Mem. at 2.  Video surveillance showed Defendant, Daza, and Betancur-Lopez pushing a cart containing jewelry out of the convention while Ducuara distracted the jewelry vendor.  PSR ¶ 9.  Defendants stole twenty-three Rolex watches and numerous antique coins.  *Id.*

On October 22, 2022, Defendants entered a jewelry exposition at the Javits Center in New York, New York, and stole jewelry valued at $418,778.00 from two vending booths.  *Id.* ¶¶ 10–11; Gov't Sent'g Mem. at 2.  Video surveillance showed Daza engaging a jeweler/vendor in conversation while Ducuara entered the jeweler/vendor's booth and removed a black case labeled "Diamond."  PSR ¶ 10.  Ducuara subsequently placed the case in Defendant's backpack, who then left the exposition.  *Id.*  Later that day, video surveillance captured Daza at a different booth where she engaged a different jeweler/vendor in conversation.  *Id.* ¶ 11.  While Daza distracted the jeweler/vendor, Ducuara stole a case of jewelry from the booth and placed it in a garbage bin.  *Id.*  Betancur-Lopez—who was wearing a yellow safety vest and posing as an

---

[5] As described in the PSR and the Government's memorandum, it is not clear whether Defendant and Ducuara kept the bag after it was taken from the truck, and, accordingly, whether this occasion would qualify as theft or attempted theft. *See* PSR ¶ 7; Gov't Sent'g Mem. at 2.  Because Defendant did not object to the facts as presented in the PSR, the Court will treat this as an attempted theft.

employee of the Javits Center—wheeled the garbage bin containing the discarded case toward a loading dock with Ducuara's assistance. *Id.* The Defendants then left the scene. *Id.*[6]

On October 26, 2022, Defendant, Ducuara, and Betancur-Lopez entered a jewelry exposition show at the Metropolitan Pavillion in New York, New York, and stole jewelry valued at $229,000.00. *Id.* ¶ 12; Gov't Sent'g Mem. at 2. Video surveillance captured Ducuara posing as a worker and pushing a hand truck while Defendant and Betancur-Lopez distracted individuals nearby. PSR ¶ 12. Ducuara then approached a jewelry booth and removed a jewelry box while the jeweler/vendor was not looking. *Id.* Ducuara placed the jewelry box inside a rolling garbage can and exited through the loading dock in the back of the building. *Id.*

On January 12, 2023, Defendants entered a coin exposition show at the InterContinental New York Barclay Hotel in New York, New York, and stole coins valued at $400,000.00. *Id.* ¶ 13; Gov't Sent'g Mem. at 2. Video surveillance captured Betancur-Lopez engaging a security guard in conversation while Defendant and Daza distracted nearby individuals. PSR ¶ 13. Ducuara subsequently opened a display case, placed various coins into a roller bag, and left the scene. *Id.*

On February 7, 2023, Defendant, Daza, and Ducuara stole jewelry valued at $236,000.00 from an individual leaving the Diamond District in New York, New York. *Id.* ¶ 14; Gov't Sent'g Mem. at 2. As the victim entered a taxicab, Ducuara punctured the taxi's rear tire. PSR ¶ 14. The driver subsequently pulled over due to the flat tire and opened the taxi's trunk, allowing the victim to remove his belongings and enter a second taxi. *Id.* When the second taxi reached John F. Kennedy International Airport and the victim exited, Ducuara dropped money on the ground to

---

[6] Defendant's involvement in the later theft on October 22, 2026 is not clear to the Court. Because the PSR treats the events of October 22, 2026 as one instance of theft —which Defendant did not object to—and Defendant's role in the second theft is unclear, the Court treats this instance as one theft. *See generally* Defendant's Sentencing Memorandum ("Def.'s Sent'g Mem."), ECF No. 126.

distract the victim while Daza approached and distracted the taxi driver. *Id.* Defendant then reached into the open trunk of the taxicab and removed a case of jewelry the victim had placed in the trunk. *Id.*

On February 14, 2023, Defendant, Daza, and Ducuara posed as employees of the Palm Beach County Convention Center in West Palm Beach, Florida, and stole jewelry from an exposition valued at approximately $3,687,900.00. *Id.* ¶ 15; Gov't Sent'g Mem. at 2. The exact number of vendors stolen from is unknown. PSR ¶ 15.

On February 17, 2023, Defendant, Daza and Ducuara approached a vendor booth at the International Jewelers Exchange in Miami, Florida, and stole watches valued at $140,000.00. *Id.* ¶ 16; Gov't Sent'g Mem. at 2. Video surveillance showed Daza engage a jeweler/vendor in conversation while Ducuara reached into a display counter to take a rack of watches. PSR ¶ 16. Defendant distracted individuals nearby while Ducuara placed the rack of watches in a shopping bag and left the scene. *Id.*

On March 10, 2023, Defendant, Daza, and Ducuara attended the Atlanta Jewelry Show at the Cobb County Convention center in Atlanta, Georgia. *Id.* ¶ 17; *see* Gov't Sent'g Mem. at 2. Prior to the jewelry show, local law enforcement circulated images of Defendants to jewelry store owners and the operators of the convention. PSR ¶ 17. Ducuara entered the convention, while Daza was "actively trying to enter" and Defendant was "outside in a vehicle, acting as a getaway driver." *Id.* Probation and the Government characterize this as an attempted theft. *Id.*; Gov't Sent'g Mem. at 2.

On April 12, 2023, Defendant and Daza attempted to take a watch from an individual in Bayside, New York. PSR ¶ 18. Defendant and Daza tried to distract the individual as he entered a vehicle but were unsuccessful. *Id.; see* Gov't Sent'g Mem. at 2.

5

On August 18, 2023, video surveillance captured Defendant, Daza, and two unidentified co-conspirators observing a couple as they withdrew $5,000.00 from a bank in Edison, New Jersey. *Id.* ¶ 22. Defendant, Daza, and the co-conspirators subsequently followed the couple to a nearby store where one unidentified co-conspirator attempted to distract the couple while Defendant and Daza waited in the car. *Id.* The second unidentified co-conspirator reached into the couple's car and stole a bank envelope containing $2,000.00 in U.S. currency. *Id.*

### *Procedural Background*

On November 3, 2023, agents of the Federal Bureau of Investigation arrested Defendant in the Northern District of Georgia pursuant to a warrant issued by the Eastern District of New York in the instant case. *Id.* ¶ 26; Gov't Sent'g Mem. at 2. Co-defendant Daza was charged via complaint, misdemeanor information, and first superseding indictment on September 27, 2023, October 30, 2023, and November 3, 2023, respectively. Complaint, ECF No. 1; Misdemeanor Information, ECF No. 8; First Superseding Indictment, ECF No. 10. Defendant was added and initially charged via second superseding indictment on November 17, 2023. Second Superseding Indictment, ECF No. 11.

The third superseding indictment (the "Indictment") added the remaining co-defendants—Ducuara and Betancur-Lopez—and asserted four counts: Count One against Defendants alleged conspiracy to commit interstate transportation of stolen property contrary to 18 U.S.C. § 2314 and in violation of 18 U.S.C. § 371; Count Two against Defendant alleged entry to a secure area by false pretenses in violation of 18 U.S.C. § 1036(a)(4); Count Three against Daza alleged entry to a secure area by false pretenses, in violation of 18 U.S.C. § 1036(a)(4); and Count Four against Daza alleged interstate transportation of stolen property in

6

violation of 18 U.S.C. § 2314. Indictment ¶¶ 1–5. The Indictment also asserted criminal forfeiture allegations pertaining to Counts One and Four. *Id.* ¶¶ 6–9.

On October 1, 2024, Defendant pled guilty to Count One of the Indictment, charging him with conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371, to wit, a violation of 18 U.S.C § 2314. Plea ¶ 1. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of sixty (60) months or below. *Id.* ¶ 4. The Government agreed "no further criminal charges will be brought against the defendant for engaging in the interstate transportation of stolen property between June 2022 and October 2023, and conspiring to do so, as charged in Count One of the Indictment, and entering the secure area of an airport on March 10, 2023, as charged in Count Two of the Indictment[.]" *Id.* ¶ 5(i). Additionally, the Government agreed to request the dismissal of the remaining counts of the Indictment with prejudice as to Defendant at the time of sentencing. *Id.*

On August 16, 2024, Daza pled guilty to Count One of the Indictment. Daza Plea Agreement ¶ 1, ECF No. 48. She was sentenced on January 28, 2026, to forty-six (46) months' imprisonment, two (2) years of supervised release, restitution in the amount of $5,289,578.00, forfeiture, and a $100.00 mandatory special assessment. Daza Sent'g Mem. and Order at 1, ECF No. 127.

On October 25, 2024, Ducuara pled guilty to Count One of the Indictment and Count One of an indictment pending against him in the Southern District of New York, *United States v. Carlos Alberto Manrique Ducuara*, 23-CR-432 (S.D.N.Y.). Ducuara Plea Agreement ¶ 1, ECF No. 78. Ducuara is not yet scheduled for sentencing.

On May 9, 2025, Betancur-Lopez pled guilty to Count One of the Indictment. Betancur-Lopez Plea Agreement ¶ 1, ECF No. 96. His sentencing is scheduled for April 14, 2026. Scheduling Order, ECF No. 136.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the United States Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the United States Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar

conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

### III.    Analysis

#### A. The Nature and Circumstances of the Offense and the History and Characteristic of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

##### i.  *Family and Personal History*

Defendant was born on September 18, 1983 in Bogota, Colombia.[7] PSR ¶ 67. His parents, Armando Arenas and Carmen Polo, maintained a romantic relationship until 1995 when Defendant was twelve years of age. *Id.* Defendant stated his father was a merchant who sold clothes and school supplies in Cali, Colombia. *Id.* In 2002, Defendant's father was murdered for refusing to pay local guerilla groups for permission to work in the local market. *Id.* Defendant and his father shared a good relationship prior to his death. *Id.*

Defendant's mother resides in Chile where she works as a sales representative. *Id.* They have a "poor relationship" because, according to Defendant, his mother abandoned him to live with another person when he was twelve years of age. *Id.* ¶¶ 67, 70. Nevertheless, Defendant communicates with his mother approximately once per month. *Id.* She is aware of the instant case and remains supportive. *Id.*

Defendant has four brothers.[8] His older brother, Yesid Armando Arenas Polo, was killed in 2003 in retaliation after his family sought to report to authorities the individuals responsible

---

[7] U.S. Immigration Customs and Enforcement ("ICE") records indicate Defendant was born in Brazil. PSR ¶ 67 n.1.

[8] In a conversation with Defendant's ex-wife—Vivianna Ramirez Rozo—to corroborate his background, Rozo indicated Defendant's younger brother is named Hector Arenas Polo. *Id.* ¶ 68. According to Rozo,

for their father's death. *Id.* ¶ 68. Defendant had a great relationship with his older brother prior to his passing. *Id.* Defendant's younger brother, Fabian Arenas Polo, is 34 years of age and resides in Bogota. *Id.* He works as an online clothing retailer, enjoys good health, and has two children. *Id.* Defendant and his brother share a good relationship, and they speak when Fabian is available. *Id.* Fabian is aware Defendant is detained and remains supportive, however Defendant noted Fabian does not know the details of his case because he is embarrassed; Defendant "does not want to set a bad example for [his] brother and [would] rather [him] believe [the defendant was] with immigration" authorities. *Id.* (alteration in original). Defendant's final two maternal brothers reside with his mother. *Id.* ¶ 69. Defendant is not in communication with them and did not provide any additional information on their background. *Id.*

Defendant was primarily raised by his parents until age twelve, under "lower-income economic circumstances." *Id.* ¶ 70. Defendant lived in a one-room house consisting of a kitchen, four bunk beds, and a floor made of concrete. *Id.* Defendant's maternal grandmother and uncle also lived with the family so they could share the rent payments. *Id.* Defendant's family generally ate once a day and their meals consisted of rice and eggs or potatoes and water. *Id.* Their meals were small and food was distributed unequally, which led to arguments within Defendant's family. *Id.* Defendant shared clothes and shoes with his brothers so he could go to a school which required a uniform. *Id.* Defendant also helped his parents at work after school. *Id.*

After Defendant's mother left when he was twelve years of age, he was raised by his extended family and did not speak to his mother again until he turned eighteen. *Id.* Defendant's

---

Hector lives in Bogota, works as a mechanic, and has two children. *Id.* It is not clear to the Court whether Hector is an additional younger brother to Defendant because the PSR indicates he only has "two siblings." *Id.*; *see also* Prob. Sent'g. Rec. at 2 (noting, after the death of their father and brother, "the defendant only had his younger brother, Fabian Polo" who he quit school to provide for).

grandmother eventually took custody of him, however she was in poor health and struggled to provide for him and his brother. *Id.* Defendant stopped attending school in the fifth grade to support his younger brother. *Id.* ¶¶ 70, 88. After both his grandmother and uncle passed away, Defendant rented a room in the city with his brother and noted he did his best to support him with the limited resources available. *Id.*

Defendant was physically abused during his upbringing. *Id.* ¶ 71. Defendant's uncle would hit him and his brothers when intoxicated. *Id.* Defendant reported this abuse to his parents but his uncle denied any abuse occurred. *Id.* The uncle's abuse of alcohol caused arguments within the family's home. *Id.* Defendant was also abused by people in his neighborhood and bullied in school because his family was very poor. *Id.* He described his childhood as "sad" and "tough" due to his family's socioeconomic status and the abuse he endured. *Id.* ¶ 70.

Defendant was in a romantic relationship with Vivianna Ramirez Rozo from approximately 2015 or 2016 until 2022. *Id.* ¶ 72. Their relationship ended because Defendant was detained by U.S. Immigration and Customs Enforcement ("ICE"). *Id.* Rozo is thirty years of age and resides in Louisville, Georgia. *Id.* She works at a shopping mall. *Id.* She enjoys good health and has been in remission from stomach cancer since approximately 2021. *Id.* Defendant and Rozo share two children: Twelve-year-old Jaylen Arenas Ramirez and eight-year-old Christopher Arenas Ramirez. *Id.* Both children reside with Rozo in Georgia and generally enjoy good health, although Christopher experiences some issues with his lungs and ear infections. *Id.* Defendant provides—without a court order—$400 biweekly to Rozo for child support, and Rozo has indicated she would struggle financially if he was no longer able to make additional payments. *Id.*

11

Defendant speaks to his children as often as possible but stated his children believe he is detained due to immigration charges. *Id.* Defendant also noted both of his children have been negatively impacted by his incarceration. Rozo and Defendant's children were present at home when Defendant was arrested. *Id.* ¶¶ 72–73. According to Rozo, the police "pointed their guns [at] her and her children" and "made her and [their] children go outside in thin clothing." *Id.* ¶ 73. Jaylen was "traumatized" by this experience and has become scared of police officers. *Id.* Christopher's grades have declined since Defendant's arrest. *Id.* Rozo, the children, and Defendant's sister-in-law, Sophia Alejandra Rozo Lopez, wrote letters to the Court expressing their support for Defendant and requesting leniency on his behalf. *See* Def.'s Sent'g Mem. Ex. B.[9]

In 2022, Defendant entered into a romantic relationship with Luz Dary Garcia. PSR ¶ 74. They married in 2023. *Id.* Garcia is forty-eight years of age and in good health. *Id.* Defendant advised they were not residing together at the time of his arrest due to tension in their relationship. *Id.* Defendant has not spoken to Garcia since a few days prior to his arrest but believes she is aware of the instant case. *Id.*

Defendant resided in Colombia until he emigrated to the United States on August 5, 2021. *Id.* at ¶ 75–76. He crossed into the country at the border between Mexico and the United States and initially settled in San Diego, California. *Id.* ¶ 75. He later settled in Flushing, Queens, with Rozo and his children. *Id.* ¶ 75. In 2022, Defendant was detained by ICE in

---

[9] There are several discrepancies between the names provided by Defendant and Probation. The PSR indicates Defendant's son is named Christopher, *see* PSR ¶ 72, however Defendant's son signs his letter to the Court as "Joshua," Def.'s Sent'g Mem., Ex. B at 17. Defendant's memorandum states his ex-wife is named "Viviana Marcela Ramirez," Def.'s Sent'g Mem. at 2, while the PSR refers to her as "Vivianna Ramirez Rozo," PSR ¶ 72. Defendant's memorandum also indicates his daughter's name is "Jaylenn," Def.'s Sent'g Mem. at 2, while the PSR refers to her as "Jaylen," PSR ¶ 72.

Florida because he did not have a work authorization VISA.[10] *Id.* Defendant returned to Flushing to be with Ms. Rozo and his children following his release from ICE custody in Florida. *Id.* According to ICE records, Defendant has an outstanding warrant of removal pending and his final removal date was April 16, 2024. *Id.* ¶ 76.

### ii. *Educational and Employment History*

Defendant attended elementary school in Bogota, Colombia until approximately 1995. *Id.* ¶ 88. He stopped attending school in fifth grade to help provide for his younger brother. *Id.* Defendant received average grades and was not subject to any disciplinary incidents. *Id.* Since his incarceration at the Metropolitan Detention Center Brooklyn (the "MDC"), Defendant has enrolled in a general education development program and participated in programming about anger management and family relationships. *Id.* ¶ 87. Defendant also advised he has basic construction skills, including roofing and painting. *Id.* ¶ 89.

Defendant worked as a delivery driver for an online food ordering service prior to his incarceration in November 2023. *Id.* ¶ 92. Defendant also worked as a day laborer and independent contractor, taking various construction and maintenance jobs. *Id.* ¶ 93. Prior to immigrating to the United States in 2021, Defendant worked odd jobs in Colombia such as painting, housekeeping and selling clothes. *Id.* ¶ 94.

A database search of the Defendant's finances revealed no assets, liabilities, liens or judgments. *Id.* at ¶ 98. Defendant appears unable to pay a fine. *Id.* ¶ 101.

### iii. *Prior Convictions*

Defendant does not have any prior juvenile adjudications or adult criminal convictions. *Id.* ¶¶ 51–55.

---

[10] According to Pretrial Services, Defendant reported obtaining a work authorization VISA prior to December 2023. *Id.*

### iv. *Physical and Mental Health*

Defendant reported that lumps appeared on both his left thigh and under his right arm in 2024. *Id.* ¶ 80; *see also* Def.'s Supplement to Sent'g Mem. at 10, ECF No. 138. Defendant received "minimal treatment" at the MDC and an unrecalled hospital in Brooklyn but received no diagnosis. *Id.* Defendant reported he remains in pain due to a lump on his leg. *Id.*; *see also* Def.'s Sent'g Mem. at 7 (noting Defendant failed to receive timely medical care to treat lymphoma on his leg).

Defendant also reported he is mentally struggling due to the "deaths, thefts, and various acts of violence" he has witnessed at the MDC. *Id.* ¶ 83. He has expressed interest in mental health treatment. *Id.* Defendant otherwise has no reported history of mental health conditions, suicidal ideations, or gambling. *Id.* ¶ 82.

### v. *Substance Abuse*

Defendant first consumed alcohol in 2021. *Id.* ¶ 84. He stopped consuming alcohol in June 2023 due to his arrest in the instant case. *Id.*

Defendant reported he began using "2C," a powder hallucinogen, in 2021. *Id.* ¶ 85. He spent between $20.00 and $30.00 per daily use or whenever he had money available to purchase it. *Id.* Defendant noted the use of 2C relaxed him but also "change[d] [his] behavior in a negative way" and led to his involvement in the instant case. *Id.* ¶ 86. He stopped using 2C in 2023 due to his arrest. *Id.*

### vi. *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

14

### B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendant engaged in sophisticated, coordinated efforts across the United States to steal items of significant value. Defendant was successful in these endeavors, as he participated in at least nine thefts and four attempted thefts totaling over $5.5 million in losses to the victims. *See* PSR ¶ 39. The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371, to wit, a violation of 18 U.S.C. § 2314. Plea ¶ 1.

Defendant faces a maximum term of five years' imprisonment and no minimum term. 18 U.S.C. § 371. Defendant also faces a maximum term of three years of supervised release. 18 U.S.C. § 3583(b)(2). If a condition of release is violated, Defendant may be sentenced to up to one year of imprisonment without credit for pre-release imprisonment or time previously served

15

on post-release supervision. 18 U.S.C. § 3583(e). Defendant is eligible for a term of probation of one to five years. 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

### D. The Kinds of Sentence and Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to consider "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A).

All parties agree the applicable guideline is U.S.S.G. § 2X1.1, which directs the Court by way of cross reference to the "base offense level for the substantive offense." Here, the base offense level for the substantive office—interstate transportation of stolen property—is found in U.S.S.G. § 2B1.1, which covers, *inter alia*, forms of theft. U.S.S.G. § 2X1.1(a); *see* PSR ¶ 38; Gov't Sent'g Mem. at 3; Plea ¶ 2. Under U.S.S.G. § 2B1.1(a)(2), Defendant has a Base Offense Level of 6.

The parties agree that certain adjustments should apply to Defendant but disagree as to others.

First, all parties agree that U.S.S.G. § 2B1.1(b)(1)(J) adds eighteen levels because the total loss stemming from the offense—based on the Government's estimates and Defendant's plea agreement—was greater than $3,500,000.00, but less than $9,500,000.00. U.S.S.G. § 2B1.1(b)(1)(J); *see* PSR ¶¶ 27, 39; Gov't Sent'g Mem. at 3; Def.'s Sent'g Mem. at 10; Plea ¶ 2.

Second, the Government and Probation agree U.S.S.G. § 2B1.1(b)(3) adds 2 levels because the offense involved a theft from the person of another. PSR ¶¶ 27, 41; Gov't Sent'g

Mem. at 3. Defendant did not provide a Guidelines calculation in his sentencing memorandum but agreed to this two-level enhancement in the Plea. Plea ¶ 2; *see generally* Def's Sent'g Mem.

Third, the Government and Probation agree U.S.S.G. § 2B1.1(b)(10)(C) adds 2 levels because the offense involved sophisticated means. PSR ¶¶ 27, 42; Gov't Sent'g Mem. at 3. Defendant agreed to this two-level enhancement in the Plea. Plea ¶ 2.

The parties similarly agree certain mitigating factors apply, but disagree as to others. The Government and Probation agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b). PSR ¶¶ 47–48; Gov't Sent'g Mem. at 3. Defendant agreed to this reduction in the Plea. *See* Plea ¶ 2.

The Government and Probation also agree a two-level reduction should apply because Defendant is a Zero-Point Offender as defined in U.S.S.G. §§ 4C1.1(a)(1)–(11). PSR ¶ 49; Gov't Sent'g Mem. at 3. Defendant agreed to this reduction in the Plea. Plea ¶ 2; *see also* Def.'s Sent'g Mem. at 14 (noting Defendant is a first-time offender).

The parties differ, however, with respect to applying a sentencing enhancement related to the number of victims. Probation notes a two-level enhancement should apply because the offense involved ten or more victims as defined in U.S.S.G. § 2B1.1(b)(2)(A)(i). PSR ¶ 40. Defendant did not include the ten-victim enhancement in his sentencing discussions. *See generally* Gov't Sent'g Mem.; Def.'s Sent'g Mem.; Plea. However, a footnote in the Government's submission recognizes Probation's inclusion of the enhancement and states, "[r]egardless, the government stands by the terms of its plea agreement with the defendant." Gov't Sent'g Mem. at 4 n.1.

All parties agree Defendant's Criminal History Category is I because he has no history of convictions or sentences. *See* U.S.S.G. § 4A1.1; PSR ¶ 53; Gov't Sent'g Mem. at 4; Def.'s Sent'g Mem. at 13.

Because the parties disagree on the enhancements, they arrive at different calculations for the applicable Guidelines range. The Government calculates a Total Adjusted Offense Level of 23 which, with a Criminal History category of I, results in a Guidelines range of forty-six (46) to fifty-seven (57) months' imprisonment. Gov't Sent'g Mem. at 4; *see also* U.S.S.G. § 5A. Probation calculates a Total Adjusted Offense Level of 25 which, with a Criminal History Category of I, results in a Guidelines range of fifty-seven (57) to seventy-one (71) months' imprisonment. Prob. Sent'g Recommendation ("Prob. Sent'g Rec.") at 2, ECF No. 104-1; *see also* U.S.S.G. §5A. Defendant does not provide a Guidelines calculation but does note the "Guidelines suggest a sentence of no less than 46 months[.]" Def.'s Sent'g Mem. at 10.

This Court appreciates the sentencing arguments raised by all parties and seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). The parties have not drawn the Court's attention to any applicable policy statements. Finding none on its own, the Court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Defendants raise disparities for defendants sentenced under U.S.S.G. § 2B1.1. Highlighting the poor conditions of confinement at the MDC, Defendant argues "Judges throughout the Southern and Eastern District of New York have repeatedly recognized that conditions at the [MDC] during the period of [Defendant's] confinement [were] exceptionally severe and, at times, inhumane." Def.'s Sent'g Mem. at 5. Defendant argues a downward variance is warranted because, "since the onset of the COVID-19 pandemic, courts in this District and the Southern District of New York have consistently accounted for the conditions of confinement at the MDC by imposing reduced sentences on defendants who spent time there pretrial." *Id.* at 6.

The Court has reviewed and considered carefully Defendant's arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities and is consistent with the sentence previously imposed on his co-defendant Daza.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order in the amount of $4,894,678.00, consistent with 18 U.S.C. §§ 3663, 3663A and 3664. Plea ¶ 1(e). Probation indicated the Government has provided contact information for the identified victims, and affidavits of loss were forwarded to the victims. PSR ¶ 25. As of the time of sentencing, no responses have been received from the victims. *Id.* The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety (90) days after this sentencing

19

to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

### IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to fifty-seven (57) months' imprisonment; two (2) year(s) of supervised release with both the standard and special conditions of supervision; restitution in the amount of $4,894,678.00, plus interest, as set forth in the forthcoming Order of Restitution; forfeiture of items identified in the Order of Forfeiture, ECF No. 107; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a)(2). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the Presentence Investigation Report and Addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises the Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 10, 2026
       Brooklyn, New York

20